

Todd E. Soloway (TS 9500)
Joshua D. Bernstein (JB 0644)
PRYOR CASHMAN SHERMAN & FLYNN LLP
410 Park Avenue
New York, New York 10022
Telephone: (212) 421-4100
Facsimile: (212) 326-0806

Attorneys for Plaintiff Castillo Grand, LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CASTILLO GRAND, LLC,<br><br>           Plaintiff,<br><br>    - against –<br><br>SHERATON OPERATING CORPORATION,<br><br>           Defendant. | No. _____<br><br><br>**COMPLAINT** |

      Plaintiff Castillo Grand, LLC ("Plaintiff" or "Castillo"), by its attorneys Pryor Cashman

Sherman & Flynn LLP, as and for its Complaint against defendant Sheraton Operating

Corporation ("Sheraton" or "Defendant"), alleges as follows:

<u>**NATURE OF ACTION**</u>

      1.     This is a diversity action for breach of contract, breach of the covenant of good

faith and fair dealing, breach of fiduciary duty, negligent performance of contract and contractual

indemnification relating to a Management Contract, dated January 26, 2001, between Castillo

and Sheraton as amended (hereinafter, the "Management Contract") relating to the construction,

management and operation of the St. Regis Hotel & Residences in Fort Lauderdale, Florida.

      2.     Pursuant to the terms of the Management Contract, Plaintiff was to construct a

hotel and residence in Fort Lauderdale, Florida under the St. Regis "flag" (the "Hotel") and

Defendant agreed to supervise, direct and control the management, operation and promotion of all aspects of the Hotel as Plaintiff's agent and as the exclusive operator of the Hotel during the term of the Management Contract and to collaborate with Plaintiff to develop the interior design of the Hotel.

3.    The Hotel being constructed is a twenty-five story, five-star luxury hotel consisting of three major components: (i) a hotel component located in the first fourteen floors; (ii) a condo-hotel component located on the fifteenth, sixteenth and seventeenth floors; and (iii) a residential condominium component located on the eighteenth through twenty-fifth floors.

4.    The hotel component described above is comprised of at least twenty-six different guest room layouts, an expansive, open lobby, a full spa, multiple ballrooms and meeting rooms, as well as high-end restaurants and bars.

5.    Because the Hotel includes at least twenty-six different guest room layouts, the architectural design and construction for the Hotel is dependent on first having in place a complete design of each guest room layout.  For example, the architectural design and construction plans for the plumbing system cannot be completed until the location of all toilets, sinks, and showers in each of the guest rooms are set by the interior designer.

6.    Because of the Hotel's dependency on the interior design, any change in design and/or designer has a "ripple-effect" on the planning, design and construction of the Hotel. Changing the already approved interior design of the guest rooms requires the architect to perform substantial revisions to the architectural plans for the entire building, an extremely time consuming and costly process.

7.    Pursuant to the Management Contract, and in order to make sure that the interior design of the Hotel met Defendant's standards for a St. Regis hotel, Defendant was required to

collaborate with Plaintiff to develop the interior design of the Hotel by, among other things, (1) providing Plaintiff with a multi-volume Design Guide setting forth Defendant's mandatory requirements for St. Regis brand hotels; (2) reviewing and approving conceptual, preliminary and final plans and specifications for the hotel to ensure compliance with the Design Guide; and (3) approving the selection of the design professionals, including the interior design firm and the architectural firm engaged to perform the work.

8.      Despite Defendant's contractual obligation to do so, Defendant never provided Plaintiff with the Design Guide (defined below).

9.      As a result of Defendant's failure to provide the Design Guide to Plaintiff and its complete failure to act in accordance with its contractual obligations, the entire interior design process lacked a cohesive and coordinated vision and contributed to the failure to achieve timely completion of the Hotel's construction.

10.     Instead of engaging in the collaborative effort design and construction of the Hotel as contemplated by the Management Contract and reasonably expected by Plaintiff at the time contracting, Defendant, through either sheer incompetence or as a deliberate scheme, abused the approval process under the Management Contract by using the interior design process as a research and development tool to develop the St. Regis brand, to Plaintiff's detriment.

11.     Throughout the course of the Hotel's development and construction, and continuing today, Defendant had numerous high-level executives involved in dictating the interior design of the Hotel, approving interior designs and designers, only to subsequently reject the previously approved interior designs and designers.

12.     Those high-level executives included, without limitation, Barry Sternlicht (Defendant's former chairman); Steven Heyer (Defendant's current chief executive officer); Ted

Darnall (Defendant's Executive Vice President); Thomas Smith (Defendant's Senior Vice President of Real Estate); Richard Cotter (former President of St. Regis Resorts & Hotels, Defendant's affiliate); Atef Mankarios (former President of St. Regis Resorts & Hotels, Defendant's affiliate); Bob Shinn (Defendant's Senior Vice President for Architecture, Construction and Design); Ellen O'Neil (Defendant's Vice President of Design); and Steven Alden (Defendant's Vice President of Development).

13.     Defendant repeatedly approved the retention of specific interior designers and their specific designs only to subsequently reverse course; reject the previously approved interior design; demand the firing of the interior designer and the redesign of the entire hotel – all after the interior designs were substantially (if not totally) completed and coordinated with the architectural and construction plans.

14.     As detailed below, Cotter, the then-President of St. Regis Resorts & Hotels, directed Plaintiff to retain the initial interior designer, DiLenardo International, Inc.  That designers' plans were subsequently approved by Darnall in July 2003.

15.     Immediately thereafter, Mr. Mankarios, the next President of St. Regis Resorts & Hotels, insisted that the first interior designer be replaced, a new interior designer be retained and simultaneously recommended three new interior designers.

16.     The second interior designer (Vision Design, Inc.) was hired with Defendant's prior written approval from the list of designers given to Plaintiff by Defendant.

17.     And Defendant, through Sternlicht, O'Neil and Shinn (among others) were intimately involved in the development of the second interior designers' design.

18.    In the first instance, Defendant directed Vision to use a "yacht-style" design for the interior design of the Hotel, then subsequently rejected that design and directed Vision to implement a specific "British Colonial" design.

19.    In January 2005, Sternlicht, Defendant's chairman, personally approved the design elements prepared by the second interior designer (Vision).

20.    Nonetheless, in April 2005, Heyer, Defendant's new chief executive officer demanded that the second interior designer be fired and its design scrapped under threats of removing the St. Regis flag from the Hotel.  Thereafter, Defendant unilaterally retained a third interior designer (Hirsch Bender Associates ("HBA")) and demanded that Plaintiff employ this designer on the project.

21.    Even after Defendant's unilateral retention of HBA, Defendant's mismanagement of its design assistance and approval responsibilities caused even more delays to completion of the project.

22.    The delays caused by Defendant's mismanagement of the project and its repeated abuse of the approval process under threat of pulling the valuable St. Regis flag from the project if its demands were not met, together with Defendant's failure to provide Plaintiff with the Design Guide, has delayed the construction of the Hotel by over 15 months (as of the filing of this Complaint) and caused over $60 million in damages to Plaintiff.

23.    As described in more detail below, due to Defendant's failure to provide Plaintiff with the Design Guide, and their violation of the design process set forth in the Management Contract, Plaintiff has been forced to endure enormous delays in connection with the construction of the Hotel, significant construction cost overruns, lost revenue, increased capital contributions, and other losses, resulting in over $60 million in damages.

## THE PARTIES

24.     Plaintiff is a Florida limited liability company, with its principal place of business in Clearwater, Florida and is the owner of the property located at 1 North Fort Lauderdale Beach Boulevard in Fort Lauderdale, Florida upon which the Hotel is being built.

25.     Upon information and belief, non-party Starwood Hotels & Resorts Worldwide, Inc. (collectively with Sheraton hereinafter referred to as "Starwood") is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business at 1111 Westchester Avenue, White Plains, New York 10604.

26.     Starwood Hotels & Resorts Worldwide, Inc. was the original signatory and Operator under the Management Contract.

27.     Upon information and belief, defendant Sheraton is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1111 Westchester Avenue, White Plains, New York 10604.

28.     Pursuant to section 14.2 of the Second Amendment to Management Contract, dated July 2003 (the "Second Amendment"), the parties agreed that Starwood inadvertently executed the Management Contract and that Sheraton has been, and will continue to be, the Operator of the Hotel under the terms and conditions of the Management Contract.

29.     Upon information and belief, defendant Sheraton is a subsidiary of Starwood.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. §1332, because the parties in interest are of diverse citizenship, and because the amount in controversy is more than $75,000.

31.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

32.    In addition to the foregoing, in section 10.3 of the Management Contract,

Defendant irrevocably submitted to the exclusive jurisdiction of the federal and state courts

located in Westchester County, New York.

## FACTUAL BACKGROUND

### I.    The Management Contract

33.    On or about January 26, 2001, Plaintiff and Defendant entered into the

Management Contract.

34.    Pursuant to the Management Contract, Defendant, acting as Plaintiff's agent,

agreed to supervise, direct and control the management, operation and promotion of all aspects

of the Hotel under their St. Regis flag.

35.    In particular, with respect to the Hotel's construction, Defendant agreed to work

in partnership with Plaintiff in developing the interior design of the Hotel to ensure that the

Hotel's design was consistent with Defendant's St. Regis brand and to reduce the costs of

construction.

36.    The express stated purpose of Defendant's responsibilities under the Management

Contract concerning the Hotel's construction was:

> (a) for the purpose of determining that the plans and specifications
> incorporate the standards and guidelines set forth in the Design
> Guide defined in Schedule 6 and the Operating Standard
> contemplated by this Contract; (b) for improving the Hotel from a
> functional and aesthetic point of view; and (c) for making changes
> that may result in cost savings in respect of the construction and/or
> operation of the Hotel. [Management Contract, Ex. G ¶5].

37.    To that end, as part of Defendant's responsibility in the design and construction

stage of the Hotel's development, Defendant was required to provide Plaintiff with a design

guide (the "Design Guide"), defined by the Management Contract (Ex. G, Schedule 6) as:

> [C]ollectively, (1) the multi-volume Design Guide, setting forth mandatory requirements for Managed Hotels[1], (2) the fire safety standards for Managed Hotels, the Fire Suppression Systems Handbook and the Guidelines for Fire Detection and Emergency Voice Alarm Communication and (3) the Fitness and Recreation Facilities Guidelines, each as then in effect on the date which is thirty (30) days prior to the awarding of a general contract for the construction of the Hotel.

38.     Additionally, with respect to the interior design of the Hotel, the Management Contract required Defendant to (i) advise and assist in defining the content of the interior design; and (ii) provide Plaintiff with a list of at least three pre-approved interior designers. (Management Contract, Ex. G, Schedule 2, ¶B(1))

39.     Defendant was also required to review and approve the preliminary and final interior designs (Management Contract, Ex. G, Schedule 2 ¶B(2) and (3)).

40.     Pursuant to paragraph 12.1.5 of the Management Contract, Defendant agreed that:

> Unless expressly stated otherwise in this Contract, whenever a matter is submitted to Party for approval or consent in accordance with the terms of this Contract, that Party has a duty to act reasonably and timely in rendering a decision on the matter.

## II.     The Design Guide

41.     Defendant breached the Management Contract by failing to furnish Plaintiff with the Design Guide.

42.     As a result of, among other things, Defendant's failure to provide Plaintiff with the Design Guide, none of the parties involved (Plaintiff, Defendant, the interior designers and the architect) ever fully understood Defendant's design intentions.

---

[1] Managed Hotels is defined in the Management Contract (Ex. B) as "all hotels and resorts in the United States that are managed by Operator and/or its Affiliates under the name "St. Regis", including all such hotels and resorts that are owned by Operator and/or its Affiliates."

43.     Plaintiff was never able to obtain from Defendant a reliable understanding of Defendant's design intentions.  Indeed, Defendant itself never had an understanding of its own design.

44.     As a result of failing to provide the Design Guide, and repeated changes in design and designers, among other things, the entire interior design process was confused, leading Defendant to constantly change the direction and vision of the interior design and therefore, the entire project.

45.     Defendant's failure to provide the Design Guide caused the entire interior design process to lack a cohesive and coordinated vision and contributed to the failure to achieve timely completion of the Hotel's construction and huge cost overruns, all of which resulted in Plaintiff suffering damages in excess of $60 million.

**III.     Selection of First Interior Designer**

46.     In 2000, at the direction of Richard Cotter, the President of St. Regis Hotel & Resorts (an affiliate of Defendant) and in anticipation of the parties executing the Management Contract, Plaintiff retained DiLeonardo International, Inc. ("DiLeonardo") as the interior designer for the Hotel.

47.     Upon information and belief, DiLeonardo had previously acted as an interior designer for Defendant in connection with other hotels and was one of Defendant's pre-approved interior designers.

48.     On or about September 26, 2000, Plaintiff entered into a contract with DiLeonardo for the interior design of the Hotel (the "DiLeonardo Contract").

49.     Defendant approved DiLeonardo's retention as the interior designer for the Hotel.

50.     The DiLeonardo Contract contemplated four phases of the interior design: (i) the schematic design phase; (ii) the design development phase; (iii) the contract document phase; and (iv) the contract administration phase.

51.     The DiLeonardo Contract further required that Plaintiff and/or Defendant furnish to DiLeonardo "full information as to their design requirements, project schedules, client's requirements for F.F. & E. [furniture, fixtures and equipment] purchasing and total budget broken down in all areas and all such information which shall be pertinent to the creation and carrying out of the Interior Design."  (DiLeonardo Contract, ¶2.1.1(1)).

52.     Pursuant to the DiLeonardo Contract, over the course of the next two years, DiLeonardo prepared interior design plans for the interior design of the Hotel (the "DiLeonardo Plans").

53.     Because the Hotel's architectural design and planning was largely driven by the interior design of the Hotel, during that period of time DiLeonardo worked in concert with Arquitectonica ("ARQ"), the architect retained by Plaintiff and approved by Defendant, to prepare the architectural/construction drawings for the Hotel and to ensure that the DiLeonardo Plans and ARQ's architectural plans for the Hotel were properly coordinated.

54.     The DiLeonardo Plans and ARQ's construction plans included the designs for all of the essential elements of the Hotel, including but not limited to the guest rooms, a full floor of ballrooms, the Hotel lobby, and a floor of meeting rooms, and high-end restaurants and bars.

55.     In or about March 2002, relying on Defendant's approval of the DiLeonardo Plans and based upon a full set of final construction plans, Plaintiff bid out the project.  In the end, on or about March 18, 2002, Plaintiff entered into a Standard Form of Agreement between

Owner and Contractor for the construction of the Hotel with a general contractor named AMEC (the "Construction Contract") for the construction of the Hotel.

56.    The Construction Contract called for a Guaranteed Maximum Price ("GMP") of $68,379,326.00.

57.    The GMP in the Construction Contract was specifically based upon the design and architectural drawings prepared by DiLeonardo and ARQ.

58.    Consistent with the parties' expectations, the Construction Contract, as amended, required that AMEC achieve substantial completion of the Hotel no later than April 2005.

59.    On or about April 25, 2002, the City of Fort Lauderdale issued a building permit for the construction of the Hotel based upon the ARQ construction plans submitted to the building department prior to the execution of the Construction Contract.

## IV.    **Loan Closing**

60.    Based upon the approved DiLeonardo Plans; the approved ARQ construction drawings and the Construction Contract, Plaintiff, working with Defendant's staff (including James Alderman, Defendant's former employee), prepared a detailed project budget, and based on that budget applied to Deutsche Bank AG ("Deutsche Bank") and Canadian Imperial Bank of Commerce ("CIBC") for a $112,000,000 construction loan.

61.    Defendant was intimately involved in the development of the project budget and in some cases, including with respect to the costs associated with furniture, fixtures and equipment ("FF&E"), dictated the amounts that Plaintiff should include in the project budget, that was submitted to Deutsche Bank and CIBC.

62.     On or about July 31, 2003, Plaintiff entered into a tri-party loan agreement to finance the construction of the Hotel with Deutsche Bank as the permanent lender and CIBC as construction lender.  Plaintiff closed on the loan on or about August 12, 2003.

63.     Pursuant to the tri-party loan agreement, CIBC agreed to provide Plaintiff with a construction loan in the amount of $112,000,000 to be used for the construction and development of the Hotel for a term of approximately twenty-four months.

64.     Additionally, pursuant to the tri-party loan agreement, Deutsche Bank agreed that at the expiration of the CIBC construction loan they would pay off the CIBC loan, thus providing Plaintiff with permanent financing.

65.     At the time of the loan closing (in or about August 2003), the total project budget was $137,825,945.

66.     At the time of the closing of the construction loan, Plaintiff's members funded approximately $25 million of the construction costs associated with the construction of the Hotel.

67.     As part of the loan closing, CIBC required that Defendant approve the $137,825,945 construction budget prepared by Plaintiff and Defendant for the construction of the Hotel as well as the DiLeonardo and ARQ plans and specifications for the Hotel's construction.

68.     In or about July 2003, Defendant, recognizing that the loan was premised on the project budget and the DiLeonardo plans and the ARQ architectural drawings and specifications specifically approved those plans, specifications and project budget in the Second Amendment. The Second Amendment (signed by Defendant's Executive Vice President, Ted Darnall) (¶13.1) states:

> [Defendant] acknowledges and agrees that the plans and specifications and project budget in existence as of the date of the Second Amendment delivered by [Plaintiff] to [Defendant] have

been approved by [Defendant] in accordance with Exhibit G of the Management Contract.

## V.  Defendant Forces Plaintiff To Fire DiLeonardo

69.     In or about May 2003, Plaintiff and AMEC decided to get a jump start on construction of the Hotel by installing pilings prior to the loan closing.  During May 2003, pilings were installed in the majority of the site, allowing pouring of concrete to begin immediately after the loan closed.

70.     In or about September 2003, with the construction loan in place and in reliance upon Defendant's approval of the DiLeonardo Plans, the ARQ construction plans and the project budget, construction of the Hotel was ready to proceed in a timely fashion.

71.     As of September 2003, with a construction schedule of approximately 18 months, the project was perfectly timed to achieve substantial completion of the Hotel's construction in accordance with the Construction Contract by April 2005.

72.     In or about September 2003, construction of the Hotel resumed with the pouring of concrete and installation of vertical risers for the first six floors.

73.     In or about October 2003, Plaintiff's members met with the then-President of Defendant's affiliate St. Regis Hotels & Resorts, Atef Mankarios at Mankarios' offices in Dallas, Texas.

74.     As of that time, (i) Defendant had approved DiLeonardo as the designer; (ii) Defendant had approved the DiLeonardo Plans and the ARQ construction plans; (iii) DiLeonardo and ARQ had substantially completed all of the design work and architectural planning; and (iv) DiLeonardo and ARQ had been paid in full.

75.     Despite the foregoing, at the October 2003 Dallas meeting, Mankarios directed Plaintiff to terminate DiLeonardo's services without any explanation other than that Mankarios did not think DiLeonardo was a good interior designer.

76.     Defendant's direction to terminate the DiLeonardo Contract contradicted Defendant's prior approval of DiLeonardo and its prior approval of the DiLeonardo Plans, the ARQ plans and the project budget.

77.     At the October 2003 Dallas meeting, Plaintiff objected to Defendant's change of direction because to do so would risk delays to the project and would lead to increases in the project budget.

78.     Notwithstanding Plaintiff's objections, Defendant insisted on removing DiLeonardo as the interior designer.  Plaintiff was then directed by Mankarios (acting on behalf of Defendant) to retain a new interior designer and later entered into a release with DiLeonardo terminating the DiLeonardo Contract.

79.     In or about October 2003, with Defendant's prior written approval Vision Design, Inc. ("Vision") was hired as the second interior designer on the project.

80.     On or about November 13, 2003, Plaintiff, at Defendant's direction, formally entered into a contract with Vision, whereby Vision was retained as the second interior designer to essentially re-design the Hotel (the "Vision Contract").

81.     As a result of Vision's wholesale revisions to the entire interior design of the Hotel, ARQ had to substantially revise the Hotel's architectural design.  This resulted in significant delays in the completion of construction documents and construction of the Hotel.

82.     In order to meet Defendant's demands, Vision was required to redesign the guest rooms; develop twenty-six (26) different guest room designs; redesign the Hotel lobby, restaurants, meeting rooms, ballrooms, and other aspects of the Hotel.

83.     During the course of the next year, Vision, together with ARQ, worked to create an interior design acceptable to Defendant despite the complete absence of a coherent design vision that Defendant was obligated to provide under the Management Contract.

84.     Vision worked with ARQ, the construction team, and representatives of Defendant including but not limited to Barry Sternlicht, Defendant's chairman, George Fong (Defendant's Vice President of Construction) and Ellen O'Neil (Defendant's Vice President of Design) to ensure that the details of the construction were coordinated with the interior design of the Hotel being prepared by Vision.

85.     Throughout the course of this process, Defendant's representatives, including Sternlicht, Fong and O'Neil, had regular involvement and communication with Vision, ARQ, the construction team and Plaintiff regarding the scope of the interior and architectural design.

86.     Indeed, by letter dated May 9, 2005, Vision informed Defendant's new chief executive officer, Steven Heyer, that

> Vision Design was explicitly directed through the guestroom design process by the St. Regis design team, who, with Mr. Sternlicht's consent, provided particulars for virtually every detail of the guestroom design. In fact, a variety of items were proposed that we, as hotel design experts, deemed inappropriate or untenable in a hospitality application (i.e., ceramic garden stool in the shower, gold-plated bath fittings, cremone bolts, etc.) Although our team and the owners fundamentally disagreed with the design provided, we acquiesced and resolved to implement the concept in preparation for the December 1 [2005] opening date.

87.     Initially, Sternlicht, Fong and O'Neil directed Vision to utilize a "yacht-style" design for the interior design of the Hotel.

473154                                    15

88.     In or about January 2004, Vision presented Plaintiff and Defendant with such a design, which Defendant rejected.

89.     Thereafter, in or about May 2004, Defendant, through Sternlicht and O'Neil, directed Vision to employ a British Colonial design for the guest rooms.

90.     By letter dated May 27, 2004, O'Neil, on behalf of Defendant, provided Plaintiff with the details for virtually every aspect of the guestroom design based upon the British Colonial motif Defendant desired, which O'Neil hoped "will convey the design direction that Barry Sternlicht has called out for the St. Regis, Fort Lauderdale Project."

91.     O'Neil's May 27, 2004 letter to Plaintiff further stated that "Upon reviewing the latest design submission from Vision Design, Barry [Sternlicht] felt that this is a more timeless, elegant aesthetic for a beachfront property bearing the St. Regis flag."

92.     During the course of the succeeding months, Defendant continued to demand additional interior design changes to the Hotel, including changes to the kitchen layout and the décor.

93.     In November 2004, Plaintiff and Defendant met at Defendant's offices in White Plains, New York to discuss the continued changes in design demanded by Defendant. This meeting was insisted upon by Plaintiff because the continuing changes in design demanded by Defendant were continuing to increase the previously approved project budget and delaying the completion of construction.

94.     Indeed, by letter dated December 22, 2004, Vision informed Plaintiff that Defendant's continued design changes were preventing Vision from completing the interior design of the Hotel.

95.     In that letter Vision explained "securing clear guidance and timely decisions from [Defendant] has proved to be a significant and on-going challenge that continues to delay our progress" and "[w]ithout a clear and concise reporting protocol or single point of contact for design decisions, our communication with [Defendant] has been sporadic and fragmented, often resulting in confusion and additional delays.  Even those elements of the project that appear to be agreed and sanctioned (e.g., guestroom color scheme) have been reversed or changed after the fact."

96.     Defendant's continued design changes and failure to give Vision and Plaintiff clear guidance and make timely decisions further delayed the completion of construction documents and construction of the Hotel.

97.     In or about January 2005, a meeting was held between Plaintiff, Defendant and Vision at Defendant's White Plains headquarters for the purpose of finally obtaining Defendant's approval for the proposed design of the Hotel rooms which Sternlicht and O'Neil had previously directed Vision to develop.

98.     Defendant's chairman Barry Sternlicht, was in attendance as Defendant's lead representative.

99.     At this meeting, Vision presented to Defendant the revised design demanded by Defendant, including furniture type, carpet, stone, fabric, plumbing fixtures and hardware.

100.    The Defendant's chairman, Barry Sternlicht, personally approved the design.

101.    After Sternlicht's approval of the design, Van McNeel (one of Plaintiff's members) asked Sternlicht twice to confirm that Sternlicht's approval constituted the final design direction by Defendant.  Both times Sternlicht confirmed his agreement.

102.    Thereafter, Vision and ARQ ordered the materials and built out the new model room.

103.    Between January and April 2005, Vision and Plaintiff built out the model room within the Hotel according to the design approved by Defendant's chairman at the January 2005 meeting.

104.    During the same period of time, Defendant hired a new chief executive office, Steven Heyer to replace Mr. Sternlicht.

105.    As of April 2005, Vision had completed its design plans (as approved by Defendant), of the guest rooms and all of the other elements of the project, including the lobby, ballrooms, meeting rooms, and restaurant, and was ready to proceed with construction of the interior of the Hotel.

106.    Also at this point in time, construction of the core and shell of the Hotel was proceeding based upon the Vision design and the ARQ plans (which had been substantially revised due to the previous design changes).

107.    In April 2005, Vision presented the new model room to Plaintiff and Defendant.

108.    The presentation was attended by the various representatives of Defendant including Defendant's new chief executive officer, Steven Heyer.

109.    At the presentation, Defendant's team first met alone to inspect the model room and discuss their reactions.  Plaintiff was then invited into the model room to hear Defendant's comments.

110.    Defendant's new chief executive officer – Steven Heyer – unreasonably rejected the design of the new model room in its entirety and demanded that Plaintiff fire Vision and retain yet another interior designer despite the fact that (i) the British Colonial motif designed by

Vision was demanded by Defendant; and (ii) that the chairman of Defendant approved this specific design in the January 2005 meeting.

111.    At the presentation, Plaintiff's managing member, Fred Bullard, informed Mr. Heyer (and the rest of Defendant's team) that Plaintiff was unwilling to do anything that would further delay the Hotel's construction or result in further cost overruns, and refused to hire a new interior designer.

112.    In response, Mr. Heyer threatened to pull the valuable St. Regis flag and make the Hotel a "Westin" if Plaintiff did not change designs and designers as demanded by Defendant.

113.    Plaintiff refused to retain a new interior designer.

## VI.    Defendant Unilaterally Retain Yet Another New Designer

114.    In or about May 2005, Defendant informed Plaintiff that they unilaterally hired a third interior design firm, Hirsch Bender Associates ("HBA"), to replace Vision (who Plaintiff had retained with Defendant's prior approval and recommendation) and once again re-design the interior design of the Hotel despite the fact that Vision had completed its work (other than overseeing construction) and been paid in full by Plaintiff.

115.    Upon information and belief, Defendant entered into a contract with HBA to provide interior design services.

116.    Notwithstanding Defendant's unilateral retention of HBA, Defendant's repeatedly demanded that Plaintiff pay HBA for its services. Plaintiff refused to pay any fees for HBA's services.

117.    Throughout the course of HBA's involvement in the project, Defendant directed HBA to make numerous design changes which caused ARQ to substantially revise the architectural plans for the Hotel and brought the Hotel's construction to a standstill.

118.    These design changes caused tremendous increases in the construction cost of the Hotel above that contemplated by the construction budget approved by Defendant and has delayed the completion of the Hotel's construction by over 15 months (as of the filing of this Complaint).

119.    At the time of Defendant's retention of HBA, the building structure was complete, the plumbing was "roughed in," the electrical and HVAC work was underway, the framing was complete and the drywall was installed in many of the rooms.  Moreover, the lobby, restaurant and kitchen were all roughed in and the concrete had been poured.

120.    Had Defendant not violated the Management Contract and its fiduciary obligations to Plaintiff by demanding that Vision be replaced and a new interior design scheme be implemented, Plaintiff was would have completed the Hotel's construction by December 2005 or sooner.

121.    Because of the second change in interior designers, construction work on the Hotel came to a standstill.

122.    This work stoppage caused the completion of the Hotel's construction to be significantly delayed.

123.    On or about May 3, 2005, an initial meeting was held with HBA concerning the interior design of the Hotel.

124.    On the same day, Plaintiff informed Defendant that the changes in design and designers would cause Plaintiff significant damages.  Such damages included (i) the loss of the Deutsche Bank permanent loan which was scheduled to expire in January 2006; (ii) potential losses of sales on the condominium and time share units and demand for credits from purchasers; and (iii) the loss of some or all of the hotel "season" in Florida.

125.    On or about June 2, 2005, HBA held a presentation at their offices in Atlanta to present a rendering of yet another new interior design for the Hotel's guest rooms.

126.    The June 2, 2005 presentation was attended by Defendant's upper level management, including Heyer, and Ted Darnall (Defendant's Executive Vice President), many other representatives of Defendant, the entire HBA staff, Plaintiff's members, including Mr. Bullard, and Roy Newsome, President of Sound Construction Group, Inc., the construction manager for the project.

127.    Upon information and belief, the new HBA design contemplated significant changes to the design of the guest rooms which if implemented would significantly increase the total project budget and delay completion.

128.    At the June 2, 2005 presentation, Mr. Newsome urged HBA and Defendant to recognize that the re-design of the guest rooms was only one aspect of the project that was lagging behind schedule.  Mr. Newsome urged HBA and Defendant to also focus on the design and planning of the ballrooms, meeting rooms and lobby.  Mr. Newsome further requested that Defendant and HBA exercise extreme restraint in modifying the Vision interior design to avoid further delays and cost overruns.

129.    In an effort to mitigate the damages being suffered due to Defendant's repeated change to the design and architectural plans for the project, Defendant agreed at the June 2, 2005 presentation that (i) HBA's redesign would not change the electrical, framing, drywall removal or plumbing fixtures; (ii) all items reviewed in the presentation would be investigated as to the impact on time and costs, which would be a major consideration for any changes; and (iii) Defendant would consider a $15,000,000 interest-free mezzanine loan to Plaintiff for the completion of the project.

130.   Eventually, HBA also prepared drawings for the new design of the Hotel's lobby, ballrooms and meeting rooms.  These designs called for substantial increases in, among other things, the amount of millwork and marble.

131.   This third new design significantly increased the project budget previously approved by Defendant, required substantial revisions to the architectural plans, and delayed construction of the Hotel's public areas.

132.   Notwithstanding the agreement reached at the June 2, 2005 meeting, on or about June 6, 2005 at Defendant's instruction, HBA delivered revised plans that called for changes to the framing and electrical changes, which had the effect of further delaying construction and increasing the cost of construction.

133.   On or about August 22, 2005, HBA presented a model room to Plaintiff and Defendant in the Hotel and Defendant approved the model room with certain conditions.

134.   After the presentation of the model room, on the same day HBA presented its public area concept design, consisting of the lobby, restaurant and ballrooms and meeting rooms.

135.   At that time, the architectural and construction drawings for those public areas had already been completed and permitted and much of the ductwork and other aspects of the public area construction had been completed.

136.   Upon information and belief, at that point, Defendant still had not given final approval to the public areas, including the lobby, ballrooms and restaurant.

137.   On or about September 19, 2005, another public area design review was held.

138.   The attendees of the September 19, 2005 public area design review included Steven Heyer (chief executive officer of Defendant), Stephen Alden (President of St. Regis, an affiliate of Defendant), as well as other members of Defendant interior design team.

139.   At that presentation, Defendant sought additional changes to the design of the public areas.

140.   After the September 19, 2005 presentation, on or about September 25, 2005, Bob Shinn, Defendant's Senior Vice President for Architecture, Construction and Design, sent an email to HBA stating:

> Now that the plan is set, I'm concerned your design is not in tune with SR [St. Regis] brand expectations and the dialog to get there is not happening.  I'd like someone from our design team who is a good collaborator to come work with you in Atlanta to see if we can get colors, fabrics and style to our joint satisfaction.

141.   Thus, even after the second review of the public areas, Defendant still was not prepared to approve the public area design.

142.   In or about December 2005, HBA finally sent its first set of plans for the interior design of the public areas.  Those plans were uncoordinated with the architectural designs and greatly affected significant aspects of the architectural plans and construction of the Hotel, including but not limited to wall layouts, electrical power distribution, and ductwork placement.

143.   Moreover, a key component needed by ARQ to complete their architectural design for the Hotel, the reflected ceiling plans, could not start until the public area interior design was completed by HBA.  Therefore, even working with HBA's plans as they existed in December 2005, ARQ was not able to complete its architectural design.

144.   Indeed, it was not until March of 2006 that HBA completed its interior design of the public areas and ARQ was able to begin modifying their previous design of the public areas.

145.   This delay was a direct result of Defendant's rejection of the Vision design and unilateral demand to fire Vision.

146.     As a result of Defendant's failure to timely approve HBA's designs and Defendant's violation of Defendant's agreement at the June 2, 2005 HBA presentation that HBA's redesign would not change significant aspects of the Vision design, completion of construction documents and construction of the Hotel was further delayed.

147.     In fact, even today, there are still incomplete interior design drawings (particularly with respect to the lobby, meeting rooms, ballrooms, restaurant, and bar) and therefore the construction team cannot complete the construction of the Hotel.

## VII.   Design of Kitchen

148.     At the outset of the project, Plaintiff retained General Hotel & Restaurant Supply Corp. ("General") as the food service consultant for the Hotel to assist and advice in connection with the design and construction of the Hotel' kitchen.

149.     Upon information and belief, General had previously consulted on several other five star hotel food service designs and had worked for Defendant on other projects.

150.     As of the Fall 2004, the concrete and masonry structure of the Hotel was consistent with the agreed upon layout of the kitchen and the structure in the kitchen area had been fully completed, allowing construction of the kitchen to begin.

151.     Defendant then demanded that all work cease on the kitchen area while Defendant's new food service consultant, Troy Dupuy, reviewed the plans.

152.     Defendant's demand that the completion of the kitchen be halted contributed to the delays to the construction of the rest of the public areas, including the lobby construction and to the mechanical, electrical and plumbing systems, which rose vertically from the kitchen to the other areas of the Hotel.

153.   In or about December 2004, a revised preliminary kitchen plan was presented to Plaintiff by Defendant's new consultant.

154.   Defendant's redesign of the kitchen area was a radical departure from the previous kitchen design that the Hotel's electrical system, air conditioning and exhaust ventilation system, and the plumbing system would require completely new designs.

155.   Because of this new design, through the first five months of 2005, no construction work was done on the Hotel's kitchen (other than pouring the concrete slab).

156.   During that time, General and Defendant's consultant, Troy Dupuy, worked with ARQ and a mechanical engineer (Delta G) to revise the architectural and engineering designs for the Hotel's food service area systems and to coordinate the architectural and engineering designs with the changes being made to the Hotel's kitchen by Defendant.

157.   On or about June 26, 2005, Plaintiff learned that Defendant finally approved the redesigned kitchen.  On or about February 14, 2006, the revisions to the kitchen design were released for construction by the building department.

158.   Defendant's redesign of the kitchen caused significant cost overruns and delayed the completion of the kitchen's construction by over one year.

**VIII.   Current Status of Hotel Construction**

159.   As of the filing of this Complaint the construction of the Hotel is still not completed.  These delays are the result of Defendant's breaches of the Management Contract; its complete undermining of Plaintiff's reasonable expectations in entering into the Management Contract; abuse of its fiduciary obligations to Plaintiff; and its gross negligence in performance of its obligation under the Management Contract.

## IX.    Damages

160.    As a result of Defendant's breaches of the Management Contract and abuse of the approval process, Plaintiff has suffered significant damages, including but not limited to the following:

### (i)    Increased Costs of Construction

161.    The Construction Contract provided a GMP of $68,379,326 for the construction of the Hotel.

162.    The GMP was incorporated into the project budget approved by Defendant in the Second Amendment.

163.    As a result of Defendant's repeated directions to change the interior design scheme and designers, Plaintiff was forced to add, through change orders, additional labor and materials to AMEC's scope of work.

164.    By virtue of Defendant's wrongful acts and conduct, the cost of construction has increased by approximately $19 million.

### (ii)    Increased Soft Costs

165.    The original project budget approved by Sheraton called for $6,203,592.50 in "soft costs" associated with the Hotel's construction.

166.    By August 2003, ARQ had completed a full set of construction drawings for the Hotel.

167.    By virtue of Defendant's wrongful acts and conduct, ARQ and the other consultants on the project were twice forced to entirely revise the architectural design of the Hotel.

168.   Additionally, by virtue of Defendant's wrongful acts and conduct, Plaintiff was forced to expend interior design fees well above the amount called for in the project budget.

169.   Due to Sheraton's wrongful acts and conduct, Plaintiff has incurred over $5 million in increased "soft costs."

**(iii)   FF&E/OSE/Miscellaneous**

170.   The project budget as approved by Defendant originally anticipated $9,426,650 in furniture, fixtures and equipment ("FF&E"), operating supplies and equipment ("OS&E"), and miscellaneous expenses.

171.   As a result of Defendant's wrongful acts and conduct, including, without limitation, changes in the furniture specifications and operating supply specifications, Plaintiff has incurred approximately $7.8 million to date in increased FF&E, OS&E and miscellaneous expenses.

**(iv)   Information Technology**

172.   As a result of Defendant's wrongful acts and conduct in connection with the design of the information technology systems, Plaintiff has incurred increased expenses in the amount of approximately $1.9 million.

**(v)   Increased Development Costs**

173.   As a result of Defendant's wrongful acts and conduct, Plaintiff has incurred approximately $3.5 million in increased development costs.

174.   These damages include approximately $816,000 of penalties associated with the sale of condominium-hotel units that are already under contract, because Plaintiff has been unable to close due to delays caused by Defendant's wrongful acts and conduct.

175.    These damages also include increased real estate taxes Plaintiff has had to pay above the amount set forth in the approved project budget in the amount of approximately $514,000.

176.    Defendant's wrongful acts and conduct have also resulted in an enormous construction management cost due to the need for additional construction management expertise required to manage the tremendous number of changes in design made by Defendant.

177.    Currently, Plaintiff estimates the increased construction management cost as a result of Defendant's actions to be approximately $1.6 million.

(vi)    **Loan Extension Fees**

178.    As a result of Defendant's wrongful acts and conduct, Plaintiff was been forced to seek extensions of their loans from CIBC and Deutsche Bank.

179.    Plaintiff has paid approximately $3.1 million in fees in connection with loan extensions.

(vii)    **Plaintiff's Capital Contributions/Carrying Costs**

180.    As discussed above, at the time of the closing of the construction loan, Plaintiff expected to fund approximately $25 million of the construction costs associated with the construction of the Hotel.

181.    True to that written and agreed upon understanding, by the end of 2003, Plaintiff's members had contributed approximately $25 million towards the construction costs of the Hotel.

182.    As a result of the increases in cost caused by Defendant's wrongful acts and conduct, Plaintiff's members have been forced to contribute over $40 million in additional capital as of June 2006.

183.   Plaintiff expects that its members will be forced to contribute at least an additional $15 million towards construction cost overruns.

184.   Plaintiff has been forced to carry the costs of the project during the 15-month delay.

185.   These carrying costs currently total approximately $5 million, and are increasing monthly at a rate of $350,000 per month.

(viii)   **Interest Expenses**

186.   As a result of the delays caused by Defendant's wrongful acts and conduct, Plaintiff has been forced to pay approximately $8 million in additional interest on the CIBC loan.

(ix)   **Lost Revenue**

187.   As a result of the delays caused by Defendant's wrongful acts and conduct, Plaintiff has lost revenue associated with the operation of the Hotel.

188.   Based on projections prepared by Defendant in 2003 anticipating a May 2005 opening of the Hotel, Defendant projected Plaintiff's net income for the first year of operation to be approximately $4.2 million.

189.   Based on Defendant's projections, Plaintiff estimates that it has lost approximately $5 million in revenue as of today.

190.   Additionally, as a result of Defendant's wrongful acts and conduct, Plaintiff has been unable to sell a substantial number of condo-hotel units, and has lost significant income as a result.

(x)   **Increased Administrative Costs**

191.   As a result of the delays caused by Defendant's wrongful acts and conduct, Plaintiff has been forced to incur approximately $390,000 in increased administrative expenses.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

192.    Plaintiff repeats and realleges paragraphs 1 through 191 above, as if fully set forth herein.

193.    The Management Contract constitutes a legally binding and enforceable contract.

194.    The Management Contract required Defendant to, among other things, (i) provide Plaintiff with the Design Guide; (ii) collaborate with Plaintiff in defining the interior design of the Hotel; and (iii) provide advice and technical recommendation to the interior designer on the functional layout of guest rooms and other matters.

195.    The Management Contract further granted approval rights to Defendant for, among other things, the interior designer and the design presentation.  In connection with those approval rights, Defendant had a contractual duty to act reasonably and timely.

196.    Defendant materially breached the Management Contract by, among other things, failing to provide Plaintiff with the Design Guide and failing to provide the advice and technical recommendations to the interior designers as contemplated by the Management Contract.

197.    Defendant further materially breached the Management Contract by, among other things, violating their duty to act reasonably and timely in repeatedly changing the interior design and architectural plans; and in rejecting the interior designs and designers after previously approving each interior design and designer.

198.    Plaintiff has complied with its obligations under the Management Contract.

199.    As a consequence of Defendant's breaches of the Management Contract, Plaintiff has incurred damages, including but not limited to damages associated with the substantial delays to the Hotel's construction, significant increased construction costs and lost revenues.

200.   By virtue of Defendant's wrongful acts and conduct, Plaintiff has been damaged in an amount to be determined at trial but not less than $60 million, plus interest.

## SECOND CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing)

201.   Plaintiff repeats and realleges paragraphs 1 through 200 above, as if fully set forth herein.

202.   Under Florida law, which governs the Management Contract, the covenant of good faith and fair dealing is implied in every contract.

203.   The Management Contract granted approval rights to Defendant for, among other things, the review and approval of the interior designer and the design presentation.

204.   The Management Contract imposed a duty on Defendant "to act reasonably and timely in rendering a decision" whenever a matter is submitted to them for approval and consent in accordance with the terms of the Management Contract.

205.   By reason of Defendant's wrongful acts and conduct, including but not limited to Defendant's repeated approval of the retention of specific interior designers and their specific designs only to subsequently reject the previously approved interior design and demand the firing of the interior designer, Defendant's breached the covenant of good faith and fair dealing and unfairly frustrated the agreed common purpose of the Management Contract, disappointed Plaintiff's reasonable expectations of Defendant, and thereby deprived Plaintiff of the benefits of the Management Contract.

206.   As a result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiff has been damaged in an amount to be determined at trial but not less than $60 million, plus interest.

## THIRD CLAIM FOR RELIEF

### (Breach of Fiduciary Duty)

207.    Plaintiff repeats and realleges paragraphs 1 through 206 above, as if fully set forth herein.

208.    Pursuant to Paragraph 2.1 of the Management Contract, Plaintiff engaged Defendant, and Defendant agreed to be so engaged, "as the agent of [Plaintiff] and as the exclusive operator of the Hotel during the Operating Term."

209.    Defendant owed and continues to owe Plaintiff a fiduciary duty.

210.    By reason of Defendant's wrongful acts and conduct, including but not limited to (i) Defendant's repeated approval of the retention of specific interior designers and their specific designs only to subsequently reject the previously approved interior design and demand the firing of the interior designer; and (ii) Defendant's abuse of the approval process contemplated by the Management Contract to develop and establish the St. Regis brand at Plaintiff's cost, Defendant breached its fiduciary duty to Plaintiff.

211.    As a direct and proximate result of Defendant's breach of their fiduciary duties to Plaintiff, Plaintiff has been damaged in an amount to be determined at trial but not less than $60 million.

## FOURTH CLAIM FOR RELIEF

### (Negligent Performance of Contract)

212.    Plaintiff repeats and realleges paragraphs 1 through 211 above, as if fully set forth herein.

213.    Pursuant to the Management Contract, Defendant undertook a duty to collaborate with Plaintiff to develop the interior design of the Hotel by, among other things, (1) providing

Plaintiff with a multi-volume Design Guide setting forth Defendant's mandatory requirements for St. Regis brand hotels; (2) reviewing and approving conceptual, preliminary and final plans and specifications for the hotel to ensure compliance with the Design Guide; and (3) approving the selection of the design professionals and their designs.

214.    Defendant further undertook an express contractual duty to act reasonably and timely in rendering a decision on any matter submitted to Defendant for approval or consent.

215.    Defendant was negligent in the performance of its duties under the Management Contract because Defendant, among other things, (i) repeatedly rejected interior design schemes and designers for the Hotel after previously approving those designs; (ii) failed to collaborate with Plaintiff to develop the interior design of the Hotel; (iii) provided Plaintiff and each interior designer with unclear and incomplete direction concerning the interior design of the Hotel; and (iv) failed to timely review and approve conceptual, preliminary and final plans and specifications.

216.    But for Defendant's wrongful acts and conduct, the Hotel's construction would have been completed on time and under budget.

217.    As a direct and proximate result of Defendant's wrongful acts and conduct, the Hotel's construction has been delayed by 15 months as of the filing of this Complaint and the costs of construction for the Hotel have significantly increased and Plaintiff has been damaged in an amount to be determined at trial but not less than $60 million.

## FIFTH CLAIM FOR RELIEF

### (Contractual Indemnification)

218.    Plaintiff repeats and realleges paragraphs 1 through 217 above, as if fully set forth herein.

219.    Pursuant to Paragraph 12.9.2 of the Management Contract, Defendant agreed to:

> ...[I]ndemnify, defend and hold [Plaintiff] harmless from and against any and all claims, demands, actions (including enforcement proceedings initiated by any government agency), penalties, suits and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and disbursements and any other amounts that Owner or any other Owner Indemnified Party is required to pay to third parties in connection with such matters, but excluding consequential damages sustained by Owner) that any Owner Indemnified Party or Parties may have alleged against them, incur, become responsible for, or pay out by reason or to the extent caused by (i) Operator's Grossly Negligent or Willful Acts[2], (b) an Event of Default by Operator under this Contract, or (iii) breach by Operator of any of its warranties or representations set forth in Section 11.1 or 12.2 or in Section 6 of Exhibit D.

220.    As a result of Defendant's wrongful acts and conduct, including but not limited to Defendant's grossly negligent and willful conduct in the performance of its duties and obligations under the Management Contract, Plaintiff has received demands for, incurred, and paid out substantial sums of money to third parties for increased costs (above the amounts set forth in the project budget approved by Defendant) associated with the construction of the Hotel.

221.    As a direct and proximate result of Defendant's grossly negligent and willful conduct in the performance of the Management Contract, Plaintiff has been damaged in an amount to be determined at trial but not less than $60 million.

---

[2] Operator's Grossly Negligent or Willful Acts is defined in the Management Contract (Ex. B) as "any gross negligence, willful misconduct or fraud committed by Operator, its Affiliates, the Corporate Personnel, or any of the Senior Executive Personnel in the performance of Operator's duties under this Contract. The acts or omissions (including grossly negligent, willful or fraudulent acts or omissions) of Hotel Personnel other than Senior Executive Personnel shall not be imputed to Operator or its Affiliates, or to the Corporate Personnel, or deemed to constitute Operator's Grossly Negligent or Willful Acts, unless such acts or omissions resulted directly from the gross negligence or willful misconduct of the Corporate Personnel or the Senior Executive Personnel in supervising such Hotel Personnel."

## SIXTH CLAIM FOR RELIEF

### (Attorneys' Fees, Costs and Expenses)

222.   Plaintiff repeats and realleges paragraphs 1 through 221 above, as if fully set forth herein.

223.   Paragraph 10.4 of the Management Contract provides:

> The prevailing Party in any arbitration, suit or other action arising out of or related to this Contract shall be entitled to recover from the other Party all reasonable fees, costs and expenses incurred by the prevailing Party in connection with the arbitration, suit or other action, including reasonable judicial and extra judicial attorneys' fees, expenses and disbursements and fees, costs and expenses relating to any mediation, arbitration or appeal. If any Party secures a judgment in any proceeding brought to enforce or interpret this Contract, then any costs or expenses (including reasonable attorneys' fees) incurred in enforcing, or in appealing from, such judgment shall be payable by the Party against whom such judgment or determination on appeal has been rendered and shall be recoverable separately from and in addition to any other amount included in such judgment.

224.   Defendant is liable to Plaintiff for all such costs and expenses, in an amount to be determined at trial, but in no event less than $150,000.00, plus interest.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that judgment be entered against Defendant as follows:

1.   On its First Claim for Relief, an award of Plaintiff's damages in an amount to be determined at trial but believed to exceed $60 million, plus interest;

2.   On its Second Claim for Relief, an award of Plaintiff's damages in an amount to be determined at trial but believed to exceed $60 million, plus interest;

3.   On its Third Claim for Relief, an award of Plaintiff's damages in an amount to be determined at trial but believed to exceed $60 million, plus interest;

4.   On its Fourth Claim for Relief, an award of Plaintiff's damages in an amount to be determined at trial but believed to exceed $60 million, plus interest;

5.      On its Fifth Claim for Relief, an award of Plaintiff's damages in an amount to be determined at trial but believed to exceed $60 million, plus interest;

6.      On its Sixth Claim for Relief, an award of Plaintiff's attorneys' fees, costs and expenses in an amount to be determined at trial but believed to exceed $150,000, plus interest;

7.      Interest in an amount according to law; and

8.      Such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        July 21, 2006

                              PRYOR CASHMAN SHERMAN & FLYNN LLP
                              Attorneys for Plaintiff Castillo Grand, LLC

                              By: _____
                                  Todd E. Soloway (TS 9500)
                                  Joshua D. Bernstein (JB 0644)
                              410 Park Avenue
                              New York, New York  10022
                              (212) 421-4100