UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CASTILLO GRAND LLC

                         Plaintiff,                      06 Civ. 5526 (RPP)

        - against -

                                          **OPINION AND ORDER**

SHERATON OPERATING CORPORATION,

                         Defendant.
-----------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

        On July 21, 2006, Castillo Grand LLC ("Castillo" or "Owner") filed a complaint

against Sheraton Operating Corporation ("Sheraton" or "Operator") alleging breach of

contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary

duty, negligent performance of contract, contractual indemnification, and a claim for

attorneys' fees.  Sheraton filed an answer and alleged counter-claims of breach of contract,

unjust enrichment, and a claim for attorneys' fees on August 29, 2006.  On July 8, 2008,

Castillo filed an amended complaint (the "Amended Complaint"), adding claims for breach

of contract for wrongful termination and breach of fiduciary duty for wrongful termination.

On July 28, 2008, Sheraton filed an answer and amended counterclaims of additional

breaches of contract, breach of project license fee obligations, and a request for declaration

of Sheraton's right to terminate the contract.

        On December 8, 2008, Sheraton moved for summary judgment pursuant to Federal

Rule of Civil Procedure 56 on Claims One through Five (the "Design Claims") of the

Amended Complaint.  Castillo responded on January 16, 2009, and Sheraton replied on

March 2, 2009.  Sheraton also submitted a motion to strike the Affidavit of Fred Bullard ("Bullard Affidavit") and the Declaration of Todd Soloway ("Soloway Declaration") on March 2, 2009.  For the reasons that follow, Sheraton's motion for summary judgment is granted in part and denied in part.  Because Sheraton has shown that it is entitled to summary judgment on Claims Two, Three, Four, and Five regardless of any facts alleged in the disputed material subject to the motion to strike, and because the denial of Sheraton's summary judgment motion on Claim One is not based on either the Bullard Affidavit or the Soloway Declaration, the motion to strike is denied as moot.

## I.  BACKGROUND

On January 25, 2001, Castillo, as Owner, and Sheraton, as Operator, entered into a Management Contract (the "Management Contract") "to manage and promote the luxury hotel to be constructed by Owner in the city of Fort Lauderdale, Broward County, Florida (the 'Hotel')."  (Declaration of Eric P. Haas, executed December 8, 2008, Ex. B, hereinafter "Management Contract.")  The Management Contract divided the parties' relationship into two phases: (1) the period preceding the opening of the Hotel (defined in the Management Contract as the "Pre-Opening Period"), during which Castillo was to construct the Hotel and Sheraton was to perform Pre-Operating Services, including assistance in the design of the hotel (Management Contract, Ex. G, Sch. 6.); and (2) the post-opening period (defined in the Management Contract as the "Operating Term"), during which Sheraton was to supervise, direct, and control the management, operation, and promotion of all aspects of the Hotel as Castillo's agent and as the exclusive operator of the Hotel.  (Management Contract, Sec. 4.1.1.)

On or about May 1, 2007, the Hotel opened for business on an on-going basis to the general public.  (Deposition of Fred Bullard at 546.)  On or about August 11, 2008, Sheraton's affiliation with the Hotel ended, and the Hotel became managed by, and affiliated with, The Ritz-Carlton.  (Haas Decl. Ex. J.)

## II.      LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(c), summary judgment should be granted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Fed. R. Civ. P. 56(e).  In determining whether a genuine issue of material fact exists, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  Braham v. Clancy, 425 F.3d 177, 181 (2d Cir. 2005) (internal citations omitted).  The non-moving party, however, "may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal quotations omitted).  Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

## III.     DISCUSSION

### A.  Exculpatory clauses in the Management Contract

Sheraton first argues that all five of Castillo's Design Claims (breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, negligent performance of contract, and contractual indemnification) should be dismissed because they are barred by the following exculpatory provisions, limitations of liability, and releases contained in the Management Contract.

## 1. The Management Contract Provisions

### a. Sections 2.13.5 and 2.13.6 of the Management Contract

Section 2 of the Management Contract is entitled "GENERAL MANAGEMENT AND OPERATIONS," and 2.13 covers "Limitations on Operator's Duties."  Section 2.13.5 states:

> None of Operator, its Affiliates and their respective officers, trustees, directors, employees, agents or successors shall have any liability of any nature whatsoever with respect to the design, construction, initial furnishing, equipping or decoration of the Hotel, including with respect to any advice, assistance, recommendations or other services or approvals furnished or given by Operator or its Affiliates in connection with the Initial Capital Program[1] or any other alteration or renovation of the Hotel.  If Operator or any Affiliate thereof shall review and/or approve any plans, specifications, budgets or the like in connection with the Initial Capital Program or any other alteration or renovation of the Hotel, no such review or approval shall impose on Operator or its Affiliate any responsibility for the content thereof, for any errors or defects contained therein or for any other matter related to the design or construction of such alteration or renovation or the cost thereof.

(Management Contract, Sec. 2.13.5.)

Section 2.13.6 states:

---

[1] The Initial Capital Program is defined in Section 1 of the Management Contract:

> Owner shall cause the Hotel to the constructed in accordance with Exhibit G.  The Initial Capital Program shall be carried out by Owner in accordance with all applicable laws and regulations by qualified, licensed design and construction professionals selected by Owner and approved by Operator.

(Management Contract, Sec. 1.)

4

Owner hereby unconditionally releases Operator, its Affiliates and their respective officers, trustees, directors, employees, agents and succesors from any and all claims, liabilities and obligations, whether now existing or hereafter arising, and whether known, unknown, fixed, contingent, or otherwise, arising from or related to the matters for which Operator has disclaimed responsibility pursuant to Sections 2.13.1 through 2.13.5.

(Management Contract, Section 2.13.6.)

### b.   Exhibit G to the Management Contract

Exhibit G to the Management Contract is entitled "Technical Service and Pre-Opening Services."  It lists a number of Pre-Opening Services to be performed by Sheraton, including preparation of a Pre-Opening Budget, development of a Pre-Opening Marketing Plan, assistance with retail space and licenses, etc., and performance of the Technical Services.  (Management Contract, Ex. G, Sec. 1.)  Section 1.i states:

In consideration of the payment of the Technical Services Fee, Operator shall perform the technical services described in Schedule 2 (collectively, the "Technical Services"), in the manner and at the times contemplated in said Schedule 2. Although the bulk of the Technical Services will be performed at Operator's corporate headquarters and divisional offices, at appropriate stages in design, development and construction, Operator shall make such visits to the site and/or to the offices of Owner or Owner's architects, engineers, designers, contractors or manufacturers, as Operator may, in its sole discretion, consider appropriate to perform the Technical Services, or upon the reasonable request of Owner. Moreover, Operator shall perform such site inspections during construction as it considers appropriate to determine whether the construction program is being completed in accordance with final plans and specification approved by Operator. Operator shall participate in the final acceptance inspection of the Hotel with Owner's consultants and contractors upon substantial completion and assist Owner's consultants in the preparation of a punchlist of deficiencies requiring correction.

(Management Contract, Ex. G, Sec. 1.i.)

Exhibit G goes on to discuss Fees, Expenses and Payments to Operator in Section 3 and the Opening Date in Section 4.  Section 5 of Exhibit G is entitled "Limitations on Scope of Operator's Services" and reads:

5

Owner acknowledges and agrees that Operator's and its Affiliates' review and approval of conceptual, preliminary or final plans and specifications for the Hotel, periodically reviewing its construction and assisting in final acceptance procedures are (a) for the purpose of determining that the plans and specifications incorporate the standards and guidelines set forth in the Design Guide defined in Schedule 6 and the Operating Standard contemplated by this Contract; (b) for improving the Hotel from a functional and aesthetic point of view; and (c) for making changes that may result in cost savings in respect of the construction and/or operation of the Hotel.  Operator is not providing architectural, engineering or other professional services to Owner and does not undertake to advise Owner of Legal Requirements and shall not be responsible for compliance therewith.  Owner and Operator agree that neither any provision of this Contract nor Operator's review and approval (or deemed approval) of construction documents or construction work shall be deemed to constitute a representation or warranty by Operator as to the adequacy or quality of any such documents or materials.  Without limiting the foregoing, nothing in this Contract, and no review by Operator (or opportunity for review) of any construction documents or construction work shall be deemed to create a duty on the part of Operator that could give rise to any cause of action against Operator by Owner or any third party based on any alleged deficiency in the adequacy or the quality of the Hotel or its construction or ultimate cost.  Operator acknowledges, however, that its approval (or deemed approval) of any documents or materials submitted to Operator by Owner for review and approval pursuant to this Contract shall constitute a waiver of any right Operator might otherwise have to require changes to such items on the grounds that they do not satisfy the standards of Operator and its Affiliates.  Neither Operator nor its Affiliates shall review foundation plans or plans and specifications relating to structural matters, the foundation and structural soundness of the Hotel being wholly the responsibility of the Owner and Owner's architects and consultants.

(Management Contract, Ex. G, Sec. 5.)

Section 6 of Exhibit G is entitled "Construction of the Hotel and Installations by Owner," and subsection 6(e) contains the schedule for Castillo to submit various plans and specifications to Sheraton for approval.  The "Dates Required" for those submissions are blank.  Subsection 6(e) states,

Within fifteen (15) business days after receipt by Operator of submitted documents specified above, Operator shall either give its approval thereof or give written comments or corrections to Owner for re-submittal within the time set forth in such comments.  If Operator does not so respond within said 15-day period, the said submittal shall be deemed approved.

Schedule 2 to Exhibit G includes the "Description of Technical Services" to be performed by Sheraton in accordance with Section 1.i of Exhibit G. With respect to the Hotel Facilities, Sheraton was to provide design guidance, including production of the Design Guide to Castillo. The Design Guide is defined as:

> collectively, (1) the multi-volume Design Guide, setting forth mandatory requirements for Managed Hotels, (2) the fire safety standards for Managed Hotels, the Fire Suppression Systems Handbook and the Guidelines for Fire Detection and Emergency Voice Alarm Communication and (3) the Fitness and Recreation Facilities Guidelines, each as then in effect on the date which is thirty (30) days prior to the awarding of a general contract for the construction of the Hotel.

(Management Contract, Ex. G, Sch. 6.)

During the Conceptual, Preliminary, and Final Design Phases, Sheraton was to provide guidance and review, revise, and approve the plans. (Management Contract, Ex. G, Sch. 2.) Likewise, Sheraton was to provide assistance during the Conceptual, Preliminary, and Final Design Phases for the Interior Design, which included "[a]dvice and technical recommendation to the interior designer on functional layout of guest rooms, corridors" etc., as well as a copy of the Design Guide related to interior design. (Management Contract, Ex. G, Sch. 2, pp. 9-10.) Schedule 2 of Exhibit G lists additional obligations of Sheraton to provide design guidance and assistance with respect to the following areas:

- Mechanical and Electrical Engineering

- Life/Safety/Fire Protection Engineering

- Kitchen, Bar, Laundry and Valet Equipment

- Management Information System

- Back of the House Equipment and Operating Supplies.

(Management Contract, Ex. G, Sch. 2, pp. 11-15.)

7

### c. Section 4.2 of the Third Amendment to the Management Contract

Section 4.2 of the Third Amendment to the Management Contract is titled "No Representation" and states:

> The revised definition of Approved Debt in subsection 4.1 shall not (a) be deemed to be a representation or guarantee by Operator with respect to any aspect of the construction of the Hotel, including, but not limited to, the adequacy of the amount of the Construction Loan to fund the completion of construction of the Hotel in accordance with the Brand Standards (as defined in the DLMA), (b) make Operator liable for any construction costs for the Hotel or the repayment of the Approved Debt, and (c) limit or otherwise affect Operator's rights, under both the Management Contract and the DLMA, to approve or disapprove of aspects of the construction and design of the Hotel. This provision will continue in full force and effect subsequent to and notwithstanding the expiration or termination of either the Management Contract or the DLMA.

(Third Amd. Sec. 4.2.)

### 2. Analysis

"Exculpatory clauses 'are not favored in the law, and Florida law requires that such clauses be strictly construed against the party claiming to be relieved of liability. Such clauses are enforceable only where and to the extent that the intention to be relieved was made clear and unequivocal in the contract, and the wording must be so clear and understandable that an ordinary and knowledgeable party will know what he is contracting away.'" Hertz Corp. v. David Klein Mfg., Inc., 636 So. 2d 189, 191 (Fla. 3d Dist. Ct. App. 1994) (quoting Southworth & McGill, P.A. v. Southern Bell Tel. & Tel. Co., 580 So. 2d 628, 634 (Fla. 1st Dist. Ct. App. 1991)).[2] The seminal case in Florida on the enforceability of exculpatory clauses in breach of contract cases is Ivey Plants, Inc. v. FMC Corp., 282

---

[2] Section 12.5 of the Management Contract provides that the Contract and "all disputes relating to the performance or interpretation of any term of this Contract shall be construed under and governed by the law of the state in which the Hotel is located…" (Management Contract, Sec. 12.5.) The Hotel is located in Fort Lauderdale, Florida.

So. 2d 205 (Fla. 4th Dist. Ct. App. 1973).  "In <u>Ivey Plants</u>…[t]he court narrowly construed the language of the exculpatory clause as relevant only to independent acts of negligence by [defendant], not to breaches of express contractual obligations assumed by [defendant]…."  <u>Hardage Enters. v. Fidesys Corp.</u>, 570 So. 2d 436, 438 (Fla. 4th Dist. Ct. App. Dist. 1990); <u>see also</u> <u>Sniffen v. Century Nat'l Bank of Broward</u>, 375 So. 2d 892, 893 (Fla. 4th Dist. Ct. App. 1979) (applying <u>Ivey Plants</u> and holding that an exculpatory clause "cannot be employed to negate the specific contractual undertaking [by defendant]").

Here, the exculpatory clauses and limitations on liability in the Management Contract do not clearly and unequivocally release Sheraton from breach of contract claims. Sections 2.13.5 and 2.13.6, when read in their entirety, release Sheraton for liability relating to "error or defects" with respect to the design and construction of the Hotel; these limitations on liability do not expressly release Sheraton for any injury to Castillo caused by Sheraton's delays or failure in the performance of its responsibilities during the Pre-Opening Period of the Management Contract. (Management Contract, Sec. 2.13.5, 2.13.6.) Whether Castillo consented to such delays or failures by its words or acts are issues of fact to be determined at trial.  Similarly, Section 5 of Exhibit G does not exculpate Sheraton from liability based on breach of contract and instead states, in part, that Sheraton's "review and approval of conceptual, preliminary or final plans" does not "constitute a representation or warranty by [Sheraton] as to the adequacy or quality of any such documents or materials…"  (Management Contract, Ex. G, Sec. 5.)  Finally, Sheraton relies on selected language from a provision in the Third Amendment to the Management Contract, Section 4.2, which in effect states that by revising the definition of Approved

Debt in subsection 4.1, Sheraton would not become liable for the construction costs or the repayment of the Approved Debt.  (Third Amd., Sec. 4.2.)[3]

When strictly construed, as required by Florida law, these limitations on liability protect Sheraton from liability based on the inadequacy of the Construction Loan and from potential negligence claims or professional malpractice claims related to design or construction defects of the Hotel.  In other words, these provisions limit Sheraton's liability resulting from its approval of design and construction plans later found to be defective. The provisions of the Management Contract upon which Sheraton relies do not speak to— let alone clearly and unequivocally address—the Design Claims made in this case, which are related to the alleged breach of Sheraton's obligations under Exhibit G to the Management Contract to provide guidance, assistance, and approval for various stages of the Hotel's design.

Moreover, Sheraton has not cited any relevant case in which a court dismissed a breach of contract action based on a contract's exculpatory language.  (See Sheraton Memorandum of Law in Support of Motion for Summary Judgment ("Sheraton Mem.") p. 11, n. 39.)  Instead, Sheraton first cites a series of cases where courts upheld exculpatory provisions that limited defendants' liability for negligence claims, not breach of contract claims.  See Cain v. Banka, 932 So. 2d 575, 577 (Fla. 5th Dist. Ct. App. 2006); Greater Orlando Aviation Auth. v. Bulldog Airlines, 705 So. 2d 120, 121 (Fla. 5th Dist. Ct. App. 1998); Eller & Co. v. Galapagos Line, S.A.; 493 So. 2d 1061, 1062 (Fla. 3d Dist. Ct. App. 1986); Key Biscayne Divers, Inc. v. Marine Stadium Enterprises, Inc., 490 So. 2d 137, 138

---

[3] Sheraton's reliance on Section 5.5(b) of Developer License and Marketing Agreement (the "DLMA") is also without merit, as Castillo's claims are based on a breach of Sheraton's obligations under the separate Management Contract.  Moreover, the Section 5.5(b) similarly fails to include any clear and unequivocal language exculpating Sheraton from breach of contract claims.

(Fla. 3d Dist. Ct. App. 1986.)  Next, Sheraton relies on a string of cases involving burglary alarm contracts.  See Cont'l Video Corp v. Honeywell, 422 So. 2d 35 (Fla. 3d Dist. Ct. App. 1982), review denied, 456 So. 2d 892 (Fla. 1984), Ace Formal Wear, Inc. v. Baker Protective Service, Inc., 416 So. 2d 8 (Fla. 3d Dist. Ct. App. 1982), and Luria & Son, Inc. v. Alarmtec Int'l Corp, 384 So. 2d 947 (Fla. 4th Dist. Ct. App. 1980).  As the Florida Supreme Court explained in its denial of review in Honeywell, burglary alarm cases are a separate category of breach of contract cases involving exculpatory clauses.  Ivy Plants and Sniffen still govern non-burglary alarm cases, and therefore the burglary alarm cases are not applicable here.  See Cont'l Video Corp v. Honeywell, 456 So. 2d 892 (Fla. 1984). Finally, Sheraton cites a landlord-tenant case where a court did uphold an exculpatory provision limiting defendant's liability for a breach of contract claim based on water damage, but the exculpatory clause—unlike the provisions at issue here—was narrow and specifically limited liability due to water damage.  Meyer v. Caribbean Interiors, 435 So. 2d 936, 938 (Fla. 3d Dist. Ct. App. 1983).

Accordingly, the exculpatory provisions discussed above are not applicable to Claims One, Two, Three, Four, or Five of the Amended Complaint, and Sheraton's motion for summary judgment on those grounds is denied.

### B.  Breach of Implied Covenant of Good Faith and Fair Dealing Claim

Claim Two of the Amended Complaint alleges that Sheraton breached the implied covenant of good faith and fair dealing and "unfairly frustrated the agreed common purpose of the Management Contract, disappointed Plaintiff's reasonable expectations of Defendant, and thereby deprived Plaintiff of the benefits of the Management Contract."

(Amd. Compl. ¶ 223.)  Sheraton argues that this claim must be dismissed because the implied covenant of good faith and fair dealing is a "gap-filling" provision, and the Management Contract contained a governing provision—Section 12.1.5.

### 1.  Section 12.1.5 of the Management Contract

Section 12.1.5 of the Management Contract provides: "Unless expressly stated otherwise in this Contract, whenever a matter is submitted to a Party for approval or consent in accordance with the terms of this Contract, that Party has a duty to act reasonably and timely in rendering a decision on the matter."  (Management Contract, Section 12.1.5.)

### 2.  Analysis

Florida law imposes an obligation to act in good faith in all contracts.  County of Brevard v. Miorelli Engineering, 703 So.2d 1049, 1050 (Fla. 1997); see also Burger King Corp. v. Weaver, 169 F.3d 1310, 1315 (11th Cir. 1999).  The implied covenant of good faith and fair dealing exists in every contract because "[a] contract is an agreement whereby each party promises to perform their part of the bargain in good faith, and expects the other party to do the same."  Cox v. CSX Intermodal, Inc., 732 So. 2d 1092, 1097 (Fla. 1st Dist. Ct. App. 1999) (internal quotations omitted).  However, the implied covenant of good faith and fair dealing is a gap-filling, default rule and therefore "[i]t is usually raised when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards."  Publix Super Markets, Inc. v. Wilder Corp., 876 So. 2d 652, 654 (Fla. 2d Dist. Ct. App. 2004).

Sheraton argues that the language in Section 12.1.5 provides the standard for the parties' exercise of any approval or consent rights.  That issue need not be decided,

however, because Castillo's claim for breach of the implied covenant of good faith and fair

dealing is based on the same allegations as those underlying the breach of contract claim.

(See Amd. Compl. ¶¶ 213-216, 219, 222-225.)  "[A] breach of the implied duty may be

dismissed as redundant where the conduct allegedly violating the implied covenant is

duplicative of the companion cause of action alleging breach of contract."  Shibata v. Lim,

133 F.Supp. 2d 1311, 1313 (M.D. Fla. 2000) (citing Geler v. National Westminster Bank,

770 F.Supp. 210, 215 (S.D.N.Y. 1991)); see also Fasolino Foods Co. v. Banca Nazionale

del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992) (noting that where the implied covenant of

good faith and fair dealing is implied in every contract, the breach of the implied covenant

is "merely a breach of the underlying contract").  Here, Castillo would not be entitled to

any additional relief for breach of the implied covenant of good faith and fair dealing, and

therefore Claim Two of the Amended Complaint is redundant.  Accordingly, Claim Two

for breach of the implied covenant of good faith and fair dealing is dismissed as redundant.

### C.  Breach of Fiduciary Duty Claim

Sheraton next asserts that Castillo's third claim for relief, breach of fiduciary duty,

should be dismissed because no fiduciary duty existed.

In the Amended Complaint, Castillo claims the existence of a fiduciary relationship

between it, as principal, and Sheraton, as agent:

> Pursuant to Paragraph 2.1 of the Management Contract, Plaintiff engaged
> Defendant, and Defendant agreed to be so engaged, "as the agent of [Plaintiff] and
> as the exclusive operator of the Hotel during the Operating Term."  Defendant owed
> and continues to owe Plaintiff a fiduciary duty.

(Amd. Compl. ¶¶ 227-28.)  Castillo then alleges that "Defendant breached its fiduciary

duty to Plaintiff" by engaging in "wrongful acts and conduct, including but not limited to

(i) Defendant's repeated approval of the retention of specific interior designers and their

specific designs only to subsequently reject the previously approved interior design and demand the firing of the interior designer; and (ii) Defendant's abuse of the approval process contemplated by the Management Contract to develop and establish the St. Regis brand at Plaintiff's cost."  (Amd. Compl. ¶ 229.)

### 1. The contractual distinction between the "Operating Term" and the "Pre-Opening Period"

Section 2.1 of the Management Contract, entitled "General Management Services" provides:

> Subject to the provisions of this Contract, Owner hereby engages Operator, and Operator hereby agrees to be engaged and does undertake to supervise, direct and control the management, operation and promotion of all aspects of the Hotel as the agent of Owner and as the exclusive operator of the Hotel during the Operating Term.

According to the Management Contract,[4] the Operating Term began the day the Hotel opened for business—May 1, 2007.

The alleged conduct of Sheraton occurred during the "Pre-Opening Period," which is defined in Schedule 6 to Exhibit G of the Management Contract as "the time period extending from the Effective Date to the Opening Date."  Sheraton's duties with respect to the design of the Hotel arose from Exhibit G to the Management Contract, entitled "Technical Services and Pre-Opening Services."  (See Amd. Compl. ¶¶ 37-40.)  Section 1 of Exhibit G provided, in pertinent part:

---

[4] "Operating Term" is defined in Exhibit B to the Management Contract as "the term of this Contract, as defined in Section 4.1."  (Management Contract, Ex. B.)  Section 4.1.1 provides: "Unless sooner terminated pursuant to the provisions of this Article 4, the term of this Contract shall be the Initial Operating Term specified in the Term Sheet, together with any extensions thereof as contemplated by the Term Sheet or otherwise agreed to by Owner and Operator (the 'Operating Term')."  The Management Contract defines "Initial Operating Term" in Section 1.2 (the "Term Sheet") as "[t]he period commencing on the Opening Date and expiring at 11:59 p.m. on December 31 on the calendar year on which the Twentieth (20th) anniversary of the Opening Date occurs."  Section 4 of Exhibit G to the Management Contract defines "Opening Date" as "[t]he date which the Hotel is open for business on an ongoing basis to the general public."

>During the Pre-Opening Period, in order to facilitate a proper and orderly opening of the Hotel, Operator shall perform the following services (collectively, the "Pre-Opening Services"):…i.  Technical Services.

(Management Contract, Ex. G, Sec. 1.)

Therefore, the Pre-Opening Period and the Operating Term were separate and distinct time periods under the Management Contract.

### 2.  Analysis

#### a.  Express Fiduciary Duty

Because Section 2.1 of the Management Contract designated Sheraton "as the agent of Owner" only in connection with Sheraton's duties "to supervise, direct and control the management, operation, and promotion of all aspects of the Hotel" and not with respect to pre-opening design services governed by Exhibit G to the Management Contract, no fiduciary relationship existed with respect to the pre-opening design services.

#### b.  Implied Fiduciary Duty

Castillo does not dispute this reading of the Management Contract in their Memorandum of Law in response to Sheraton's Motion for Summary Judgment, and instead asserts that an implied fiduciary relationship existed between Sheraton and Castillo—a contention not plead in the Amended Complaint.  (Castillo Memorandum of Law in Response to Sheraton's Motion for Summary Judgment ("Castillo Mem.") p. 23.)

Under Florida law, "[t]o establish a fiduciary relationship, a party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." Taylor Woodrow Homes Florida, Inc. V. 4/46-A Corp., 850 So. 2d 536, 540-41 (Fla. 5th Dist. Ct. App. 2003) (quoting Watkins v. NCNB Nat'l Bank of Fla., NA, 622 So. 2d 1063, 1065 (Fla. 3d Dist. Ct. App. 2003));

accord Lanz v. Resolution Trust Corp., 764 F.Supp. 176, 179 (S.D. Fla. 1991).  "When the parties are dealing at arm's length, a fiduciary relationship does not exist because there is no duty imposed on either party to protect or benefit the other."  Id.; accord Maxwell v. First United Bank, 782 So. 2d 931, 934 (Fla. 4th Dist. Ct. App. 2001).

In support of its implied fiduciary duty claim, Castillo cites to Capital Bank v. MVB, Inc., 644 So. 2d 515 (Fla. 3d Dist. Ct. App. 1994).  There, the court upheld a jury's determination that a fiduciary relationship existed between a bank and a customer where the bank encouraged the customer to enter into a series of transactions despite his protestations, asked for the customer's trust, and promised the customer that he would benefit.  Id. at 519.  Because the banker's role exceeded that of a lender in a traditional lender/borrower relationship by advising the customer to expand his business and acquire certain assets, the court found that these special circumstances transformed the relationship into a fiduciary one.  Id. at 520.  Additionally, the court determined that the bank breached its fiduciary duty when it failed to disclose material information to the customer in an effort to secure a sale of assets that would benefit the bank by relieving it of an outstanding debt. Id. at 521.

The facts are distinguishable from the case at bar.  Here, unlike in Capital Bank where there was no contractual relationship governing the bank's duties, the parties were sophisticated, commercial entities who, with representation of counsel, entered into the Management Contract.  (Transcript of Oral Argument on Defendant's Motion for Summary Judgment, dated April 14, 2009 ("Tr.") at 8-9.)  Both Sheraton and Castillo bargained for contractual rights in arm's length dealings, and it is the contract that governs the

relationship.  Section 12.5 of the Management Contract is entitled "Relationship of the

Parties" and states:

> *Operator and Owner are not joint venturers, partners, or joint owners with respect to the Hotel, and nothing contained in this Contract shall be construed as creating a partnership, joint venture, or similar relationship between the Parties.*  In operating the Hotel, entering into contract, accepting reservations, and conducting financial transactions for the Hotel, Operator acts on behalf of and as agent for Owner and assumes no independent contractual liability nor shall Operator be obligated to extend its own credit with respect to any obligation incurred in operating the Hotel or performing its obligations under this Contract.

(Management Contract, Section 12.16) (emphasis added).

The Amended Complaint fails to allege any facts that would remove the parties

from the contractual language.  In fact, the allegations supporting the breach of fiduciary

duty claim are the same as those underlying the breach of contract claim.  (Compl. ¶¶ 215-

16, 229.)  Accordingly, Castillo's claim for breach of fiduciary duty is dismissed.

### D.  Negligent Performance of Contract

Sheraton seeks summary judgment on Castillo's claim of Negligent Performance of

Contract because it is barred by the economic loss rule.

#### 1.  Analysis

When parties are in privity, "tort action is barred where a defendant has not

committed a breach of duty apart from a breach of contract" and the plaintiff has suffered

purely economic loss.  Indemnity Insurance Co. v. American Aviation, Inc., 891 So. 2d

532, 537 (Fla. 2004); see also Electronic Sec. Sys. Corp. v. Southern Bell Tel. & Tel. Co.,

482 So. 2d 518, 519 (Fla. 3rd Dist. Ct. App. 1986) ("[B]reach of contract, alone, cannot

constitute a cause of action in tort."); Weimar v. Yacht Club Point Estates, Inc., 223 So. 2d

100, 103 (Fla. 4th Dist. Ct. App. 1969) ("No cause of action in tort can arise from a breach

of a duty existing by virtue of contract.").

The so-called "economic loss rule" is based on the theory that parties to a contract have allocated risk through the bargaining process.  <u>American Aviation</u>, 891 So. 2d at 536. According to the Florida Supreme Court, when a party sues in tort claiming economic loss for a breach of contract, such a party is attempting to circumvent that risk allocation and should be prevented from doing so.  <u>Id.</u>  However, this only applies where the facts needed to prove the economic loss are identical to the facts needed to prove the breach of contract. <u>See</u> <u>HTP, Ltd. v. Lineas Aereas Costarricenses</u>, 685 So. 2d 1238 (Fla. 1996) (finding that fraudulent inducement is not covered by the economic loss rule because the facts needed to prove the tort are different than those needed to prove breach of contract).

In its claim for negligent performance of contract, Castillo alleges that Sheraton: (1) rejected the design schemes and designers after approving them, (2) failed to collaborate with Castillo to develop the design, (3) provided Castillo and designers with unclear and incomplete direction, and (4) failed to review and approve plans in a timely manner. (Compl. ¶ 234.)  The only damages claimed were those resulting from the delay in construction.  (<u>Id.</u> ¶¶ 235-36.)  These are the same allegations underlying the breach of contract claim.  (<u>Id.</u> ¶¶ 215-16.)  The parties were in privity, the facts underlying the tort claim are the same as those underlying the contract claim, and Castillo has claimed solely economic loss.  Thus, the negligent performance of contract claim is barred by the economic loss rule.  <u>American Aviation</u>, 891 So. 2d at 537.

### E.  Indemnity Claim

Sheraton contends that Castillo's Fifth Claim is barred by the indemnification provision in the Management Contract, Section 12.9.2.

### 1.    Section 12.9.2 of the Management Contract

Pursuant to Section 12.9.2 of the Management Contract, Sheraton agreed to:

…[I]ndemnify, defend and hold Owner harmless from and against any and all claims demands, actions (including enforcement proceeding initiated by any government agency), penalties, suits and liabilities (including the cost of defense, settlement, appeal, reasonable attorneys' fees and disbursements and any other amounts that Owner or any other Owner Indemnified Party is required to pay to third parties in connection with such matters, *but excluding consequential damages sustained by Owner*) that any Owner Indemnified Party or Parties may have alleged against them, incur, become responsible for, or pay out by reason or to the extent caused by (i) Operator's Grossly Negligent or Willful Acts, (b) [sic] an Event of Default by Operator under this Contract, or (iii) breach by Operator of any of its warranties or representations set forth in Section 11.1 or 12.2 or in Section 6 of Exhibit D.

(Management Contract, Sec. 12.9.2)(emphasis added).

## 2.     Analysis

Section 12.9.2 of the Management Contract expressly excluded from Sheraton's indemnity obligations "consequential damages sustained by Owner." (Management Contract, Sec. 12.9.2)  Consequential damages "stem from losses incurred by the non-breaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting."  Hardwick Props., Inc. v. Newbern, 711 So. 2d 35, 40 (Fla. 1st Dist. Ct. App. 1998) (internal citations omitted).

Here, Castillo seeks to recover for the payment of "substantial sums of money to third parties for increased costs…associated with the construction of the Hotel."  (Amd. Compl. ¶ 239.)  Thus, by Castillo's own admission, Castillo's alleged indemnification damages are all in the nature of consequential damages and are excluded by Section 12.9.2

of the Management Contract.[5]  Accordingly, Count Five of the Amended Complaint is dismissed.


## IV.    CONCLUSION

For the foregoing reasons, Sheraton's motion for summary judgment is granted on Claims Two, Three, Four, and Five of the Amended Complaint and denied on Claim One.


IT IS SO ORDERED.

Dated:  New York, New York
        July 6, 2009

Robert P. Patterson, Jr.

U.S.D.J.

---

[5] Plaintiff may still recover, however, for any such damages under its breach of contract claims in Count One.

Copies of this order were faxed to:

Todd Soloway
Pryor Cashman LLP
Fax: 212-798-6328

Jim Renard
Bickel & Brewer
Fax: 214-653-1015